United States Court of Appeals,

Fifth Circuit.

No. 93-1573

Summary Calendar.

ASSOCIATION FOR RETARDED CITIZENS OF DALLAS, et al., Plaintiffs,

Advocacy, Incorporated, Plaintiff-Appellant,

v.

DALLAS COUNTY MENTAL HEALTH & MENTAL RETARDATION CENTER BOARD OF TRUSTEES, et al., Defendants,

Dallas County Mental Health & Mental Retardation Center Board of Trustees, et al., Defendants-Appellees.

April 25, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before DAVIS, JONES, and DUHÉ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Advocacy, Incorporated ("Advocacy, Inc."), the Association for Retarded Citizens of Dallas ("ARC"), and Matt W., through his guardian Judi Chamblee, sought declaratory relief, injunctive relief, and monetary damages under the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.,* and 42 U.S.C. §§ 1983, 1985, and 1986 against the Dallas County Mental Health and Mental Retardation Center Board of Trustees, the Dallas County Commissioners Court, Commissioners Jim Jackson and John Wiley Price, the McShann Road Neighborhood Association, Inc., and the Dallas County Mental Health and

1

Retardation Center.[1]  In November 1992, the district court dismissed Advocacy, Inc.'s claims for lack of standing;  in May 1993, the district court dismissed ARC's claims for lack of standing.  Shortly thereafter, the court granted Matt W.'s motion to dismiss himself as a plaintiff in this action.  Advocacy, Inc. now appeals the dismissal of its claims by the district court.[2] Finding Advocacy, Inc. to be without standing, we affirm the judgment of the district court.

DISCUSSION

A. Background

Matt W., a minor with mental retardation and cerebral palsy, resided at Crossroads, a large residential facility serving children with developmental disabilities.  In April 1991, the Texas Department of Mental Health and Mental Retardation decided to close the facility and relocate the children to small group homes located throughout the community.  The Board of Trustees of the Dallas County Mental Health and Mental Retardation Center ("the Board") took responsibility for developing three homes in the Dallas area. The Board purchased a site located at 5640 McShann Road in Dallas upon which to construct one of the small group homes ("the McShann home"), the home in which Matt W. was scheduled to live.  However, the McShann Road Neighborhood Association (the "Association")

_____

[1]Joyce Brown, Sheryl Howard, Dr. Agnes Whitley, and Dr. Paula Dobbs-Wiggins were named defendants in the original complaint, but were later dismissed upon motion of the plaintiffs.

[2]Neither ARC nor the McShann Neighborhood Association chose to participate in this appeal.

2

objected to the construction of the home, and the Board eventually voted to abandon the construction of the group home on this site, choosing instead to sell the property to the Association.

The McShann home was originally scheduled to be completed by February 1992, and Matt W. was scheduled to move in shortly thereafter, simultaneous to the closing of Crossroads. However, following the cancellation of the construction of the McShann home, it was necessary for Matt W. to move into a temporary home until another small group home in which Matt W. was to reside permanently was completed. Matt W. finally moved into that permanent home.

Advocacy, Inc., ARC, and Matt W. filed suit against the defendants asserting that the move to the temporary home caused irreparable injury to Matt W. and five other children.[3] They claimed that Matt W. had suffered severe regression in self-help skills and ambulation with his walker. Moreover, they complained that the Association's obstruction of the McShann home would inhibit the development of other group homes for disabled individuals in Dallas in the future. The lawsuit was premised on the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.,* and 42 U.S.C. §§ 1983, 1985, and 1986.

### B. Lack of Standing

On appeal, Advocacy, Inc. contends that the district court

---

[3]The five other children were not parties to this action.

erred in dismissing its claim for lack of standing.[4]  Advocacy,
Inc. asserts that it has both (1) standing on behalf of itself as
an organization as well as (2) representational standing on behalf
of individuals with developmental disabilities.

1. Standing On Behalf of Itself as an Organization

In *Lujan v. Defenders of Wildlife,* --- U.S. ----, 112 S.Ct.
2130, 119 L.Ed.2d 351 (1992), the Supreme Court stated the minimum
requirements that a plaintiff must establish in order to
demonstrate constitutional standing on behalf of itself as an
organization:

> First, the plaintiff must have suffered an injury in fact—an
> invasion of a legally-protected interest which is (a) concrete
> and particularized and (b) actual or imminent, not conjectural
> or hypothetical.  Second, there must be a causal connection
> between the injury and the conduct complained of—the injury
> has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of
> some third party not before the court.  Third, it must be
> likely, as opposed to merely speculative, that the injury will
> be redressed by a favorable decision.

*Id.* at ----, 112 S.Ct. at 2136 (internal quotes, parentheses, and
citations omitted).

Because Advocacy, Inc. failed to establish that it has
suffered an injury in fact—the first requirement under *Lujan*—it
fails to establish organizational standing in this case.

Advocacy, Inc. claims that it has suffered the requisite

---

[4]As a preliminary matter, appellees complain that Advocacy,
Inc. has raised before this court factual and legal arguments in
behalf of standing that were not raised in the district court.
Advocacy, Inc. relies not only upon new legal arguments, but it
has also submitted documents to this court which were never
presented to the district court.  We decline to consider the
newly raised matters. *See Boddie v. City of Columbus,* 989 F.2d
745, 751 (5th Cir.1993).

injury because, as a federally funded organization, it has more than a general and abstract interest in this case. Advocacy, Inc.'s statutory mandate is to protect and advocate the rights of disabled individuals[5] and, as a result of the appellees' actions, it has had to direct some of its resources to challenging the allegedly wrongful actions of the appellees. We disagree with this characterization of "injury in fact."

The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization. Advocacy, Inc.'s argument implies that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another. Furthermore, that Advocacy, Inc. is a federally funded program established in part to provide disabled individuals with legal representation does not enhance its assertion of organizational standing. If this were not so, then, for example, indigent defender organizations established pursuant to the Criminal Justice Act or any other self-styled advocacy group could assert standing to sue whenever it believed the rights of its targeted beneficiaries had been violated. This result is at odds with *Lujan*'s definition of injury in fact as the "invasion of a legally-protected interest." *Lujan,* --- U.S. at ----, 112 S.Ct. at 2136. Advocacy, Inc. and similar groups have no legally-protected interest in *not* expending their resources on behalf of individuals for whom they are advocates, at least where

---

[5]*See* 42 U.S.C. § 6042 (West Supp.1993).

the only resources "lost" are the legal costs of the particular advocacy lawsuit. *See id.; Cleburne Living Ctr. v. City of Cleburne, Tex.,* 726 F.2d 191, 202-03 (5th Cir.1984) (relying on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)) *aff'd in part, vacated in part on other grounds,* 473 U.S. 432, 105 S.Ct. 3244, 87 L.Ed.2d 313 (1985); *cf. Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27-29 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990) (fair housing agency has standing if its time and money were deflected from counseling to legal efforts against discrimination); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1525 (7th Cir.1990) (same).

2. Standing On Behalf of Disabled Individuals

Advocacy, Inc. also advances its alleged associational standing to sue on behalf of individuals with developmental disabilities. In order to have associational standing, Advocacy, Inc. must establish (1) that its members would have standing to sue in their own right, (2) that the interests Advocacy, Inc. seeks to protect are germane to its organizational purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Self-Insurance Inst. of Am., Inc. v. Korioth,* 993 F.2d 479, 484 (5th Cir.1993) (quoting *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). Advocacy, Inc. fails to establish the first prong of this inquiry because Matt W. is not a "member" of Advocacy, Inc. The

6

organization bears no relationship to traditional membership groups because most of its "clients"—handicapped and disabled people—are unable to participate in and guide the organization's efforts.

CONCLUSION

Matt W. and other disabled individuals affected by the appellees' actions have standing in a case such as this, and Advocacy, Inc. has the duty to provide them with legal assistance. Advocacy, Inc. may be permitted to participate in such a case as *amicus curiae.* However, Advocacy, Inc. does not possess standing in its own right to litigate these claims against these appellees.

For these reasons, this court AFFIRMS the judgment of the district court.